OPINION AND JUDGMENT ENTRY
This case is on appeal from the June 10, 1998 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated the parental rights of appellant, Brenda H., the natural mother, of Mark H. and Mindy H. and granted permanent custody of these children to appellee, Lucas County Children Services (hereinafter the "agency"). On appeal, appellant asserts the following assignments of error:
 "I. THE TRIAL COURT'S FINDING THAT THE APPELLANT, PURSUANT TO ORC 2151.414 (E)(1) HAD DESPITE DILIGENT EFFORTS BY THE AGENCY FAILED TO REMEDY THE CONDITIONS THAT LED TO THE INITIAL REMOVAL OF THE MINOR CHILDREN, WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.
 "II. THE TRIAL COURT'S FINDING THAT THE APPELLANT PURSUANT TO ORC 2151.414(E)(4) DEMONSTRATED A LACK OF COMMITMENT TO HER CHILDREN, OR BY OTHER ACTIONS HAD SHOWN AN UNWILLINGNESS TO PROVIDE AN ADEQUATE PERMANENT HOME FOR HER CHILDREN, WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.
 "III. THE TRIAL COURT'S FINDING THAT THE APPELLANT PURSUANT TO ORC 2151.414(E)(9) WAS UNWILLING TO PROVIDE BASIC NECESSITIES OR WAS UNWILLING TO PREVENT HER CHILDREN FROM SUFFERING PHYSICAL, EMOTIONAL OR SEXUAL ABUSE OR PHYSICAL, EMOTION OR MENTAL NEGLECT WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE."
On February 2, 1998, the above-mentioned children were placed in emergency shelter care pursuant to a telephone ex parte
order. The next day, February 3, 1998, the agency filed a complaint in dependency, neglect, and abuse pursuant to R.C. 2151.27 seeking permanent custody of the children. The agency alleged that on February 1, 1998, the children were taken into custody by the Toledo Police. Mark H. allegedly had extensive bruising, in various stages of healing, on his right thigh, leg, back, and face and a puncture wound on his foot. He stated that his mother's boyfriend, Steve B., had caused the bruising. Mark H. stated that his mother had caused the puncture wound by poking him with a knife. Both children reported that they had been sexually molested by male babysitters, namely George P. and Dan L. Appellant denied any abuse by herself, Steve B., or George P. But, she did state that the injuries could have been caused by Dan L. and that he may have molested Mindy H. However, she no longer uses Dan L. as a babysitter. The agency also alleged that the children exhibit some developmental delays and that Mark H. is aggressive and self-abusive. The agency alleged that when the children were previously in its custody, the mother failed to successfully complete the terms of her case plan.
At a shelter care hearing on February 3, 1998, the magistrate found that appellee had made reasonable efforts to prevent the need for removal of the children from the home, that continued residence in the home is contrary to the best interests and welfare of the children, and that probable cause existed to believe that continuance in shelter care was required to protect the children. The magistrate granted temporary custody of the children to appellee. The case plan developed by the agency set goals only for the children. A pretrial hearing was scheduled for March 30, 1998. The scheduling of the adjudication hearing does not appear to have been done within seventy-two hours after the complaint was filed as required by R.C. 2151.28(A).
At the pretrial hearing, the guardian ad litem submitted her findings, opinions, and recommendations to the court on March 30, 1998. She observed appellant during a scheduled visit. The guardian ad litem found that appellant appeared more interested in what the guardian was saying to others than interacting with her own children. Appellant appeared to be unable to express her feelings about missing the children to them. Mark H. expressed a desire to stay with his foster parents. Mindy H. was too young to express her desires, but did indicate that she wanted to stay with Mark H. The guardian ad litem recommended that permanent custody be given to appellee without specifically stating the basis for her opinion.
Appellant's attorney requested a continuance of the adjudication hearing to be held on April 14, 1998, because the record contained three-to-four thousand pages, appellant desired to call many witnesses, and she had not represented appellant during the prior proceedings. She was appointed to represent appellant on February 13, 1998. The court denied the motion.
An untimely adjudication hearing was held on April 14, 1998. Pursuant to R.C. 2151.28(A), the adjudication hearing is required to be held within thirty days after the complaint was filed, which would have been March 3, 1998 in this case. The disposition hearing immediately followed and was continued on May 13 and May 15, 1998. The following evidence was presented during the adjudication hearing.
The parties stipulated to the allegations of the complaint except as to those allegations pertaining to the events which brought the children into custody in February 1998. Michael Bell, a caseworker, testified that the agency was notified on January 31, 1998 that Mark H. had marks on him allegedly caused by a babysitter. Bell investigated the situation on February 1, 1998. The children had been staying with a prior foster mother, Cindy Devries, for the weekend. Devries had been the foster mother for the children for approximately a year and a half from 1994 through 1996. Since that time, she had continued a relationship with appellant and periodically, took the children on weekend visits.
On February 1, 1998, Bell saw that Mark H., nearly five years old at the time, had bruises on his eyes, the middle of his forehead, the center of his neck, right thigh, top of his right foot, and his upper right arm. He also had a mark on the right side of his neck that appeared to be caused by ringworms. Mark H. stated that the marks on his thigh were caused by his "daddy" (later identified as Steve B., appellant's boyfriend) who had given him a "whooping." Bell observed that the marks were consistent with having been beaten with a belt and did not appear to have been self-inflicted or caused by a fall because of the spread of the marks. Mark H. first stated that the marks on his face were caused by falling from a chair while being rocked by his babysitter. He also stated that the pen-sized cut on his foot was caused by appellant cutting him with a knife. Mark H. stated that the marks on his neck were caused by a babysitter, George P., hitting him with a toy. Mark H. also stated that George P. had taken Mark H.'s pants off; and placed a firecracker on Mark H.'s "pee wee," and almost lit the firecracker with a cigarette. He stated that George P. had done this because Mark H. had not picked up his toys.
Both children were then brought to the agency. Bell then questioned Mindy H. because she had disclosed some disconcerting things to the foster mother during the drive to the agency. Mindy H., four years old at the time, disclosed to him that appellant and "daddy" spank her on the back with a belt, that the babysitters, George P. and Dan L., had touched her in her "potty parts."
Bell later questioned Steve B. about Mark H.'s injuries and he denied any knowledge of the bruising. He claimed that Mark H. had fallen while Dan L. was babysitting and hit his face. Later, when appellant was located, she denied knowledge of the bruising on Mark H. and accused him of hurting himself with a screwdriver and lying.
Kay Cadlar, a register nurse employed by the agency, testified that she examined both children on February 1, 1998. She found that Mindy H. had scattered bruises on her legs that did not appear to have been inflicted by someone. However, she tensed up during the vaginal exam. The child stated to Cadlar that George P. and Dan L. had touched her with her pants off. Mindy H. also stated that George P. had tried to pull her into bed with him and lay with her.
Cadlar documented Mark H.'s bruises. During the exam, Mark H. told her that Dan L. had caused the bruises around the eyes by punching him. He also related the story to her about falling out of the chair while Dan L. was rocking him. Dan L. was described as a man who lives around the house. Mark H. accused his "dad," Steve B., of causing the bruises in the middle of his forehead and on his thigh by beating him with a belt. Mark H. accused appellant of cutting his foot with a knife. The cut appeared to be infected. Mark H. also accused Dan L. and George P. of improperly touching him and George P. of putting a firecracker on his penis and threatening to light it. Both children were referred to Dr. Gemmill. Cadlar believed that the type of bruises she observed on Mark H. had to have been inflicted by someone.
The next day, Cadlar attended a meeting with appellant. Cadlar testified that during the meeting, appellant denied knowledge of the bruising and accused Mark H. of lying and self-inflicting the bruises. Appellant also stated that Mark H. has developmental delays, is aggressive, wets the bed, and urinates around the house. However, she had only sought treatment for him once in the past year for biting his toes. Appellant could not believe that Steve B. would harm the children, although she admitted that he does spank the children. She did believe that Dan L. could hurt Mark H. because he is "slow." She also stated that Dan L. and George P. could not have done this because they had not babysat the children since before Christmas. Steve B. had been the only person alone with the children in the prior several days. Cadlar did not believe that the bruises were more than two weeks old, probably four-to-six days old. Appellant explained that Dan L. and George P. were very close friends that spent a lot of time in the home. Steve B. was her boyfriend. Appellant did not express any concern that her children had been harmed.
Submitted into evidence was the medical report of Dr. Gemmill. In his report, Dr. Gemmill indicated that he examined the children on February 2, 1998. He found that Mark H.'s examination normal except that he had bruising on his right thigh that would have been difficult to have been caused accidentally, especially without a reasonable story to explain it. Furthermore, he found that Mark H. had ringworm lesions on his neck and thorax that had been partially treated. Dr. Gemmill's examination of Mindy H. revealed no findings suggestive of physical or sexual abuse.
Cindy Devries, the prior foster mother, testified that she was in favor of appellant getting her children back in June 1996. Since that time, Devries had the children visit overnight at least once a month and has seen them on other occasions, except for a four-to-five month period when appellant made no contact with Devries. During their visits, appellant would be accompanied by a man; first Chris, then Jim, then Bill, and finally Steve B. The children referred to Jim and Steve B. as Daddy. Devries was concerned about the children on several occasions during this time. She had called the agency several times, anonymously, and inquired whether anything could be done and was told that they would need more proof. She recalled appellant stating that Mark H. was self-abusive. Appellant also told her that Mark H. urinated on someone's foot and got into the food while they wer all asleep. Devries observed that Mark H. was very aggressive, as he had been when she was his foster mother. She never saw the children with any bruises that appeared suspicious. However, both children would sometimes cry when they had to go home and would say that they had been hit. Two to three weeks before the children had come to visit on January 30, 1998, appellant had told Devries that she had fired Dan L. as a babysitter because he had let Mark H. rock on a high chair and fall off bruising his face. Appellant had also indicated that Mark H. had stopped going to school because he had ringworm for three to four weeks and then had bruises. During the weekend that Mark H. came to stay with her, Devries purchased some medicine to treat his ringworm.
On January 30, 1998, Mark H. told Devries when she picked them up that George P. and Dan L. had put a firecracker next to his penis and were threatening to blow it off. Mindy H. also stated that they were firing firecrackers in the house at that time. Mark H. said that he screamed and Mindy H. indicated that she put her hands over her ears. During the ride to the agency on February 1, 1998, Devries heard Mindy H. blurt out that she had been improperly touched.
Sydney Smith, an investigative caseworker, testified that she investigated appellant's household in October 1997 unannounced. She had been contacted in August by someone in the home while an argument was going on between appellant and a man. The testimony is unclear as to whether it was appellant who had made the call. Smith told appellant to contact the police and she did as well. The police arrested Jim S. that night and he remained incarcerated throughout Smith's involvement with the case. She believed that the children were in the home at the time.
She made an unannounced call at the home the next day, but no one was home. She called on appellant again on September 2, 1997, and appellant was home with a female friend, whom appellant referred to as a babysitter. Appellant became very distraught because of her presence and would not allow her to enter the home. The friend agreed to help calm appellant down and prepare her for another meeting. Two days later, Smith visited the home. At that time appellant indicated that she had been in jail and that she was very upset with the agency being involved again. Another meeting was arranged on September 4, 1997, but appellant was not home when she arrived. Smith sent appellant a letter dated September 12, 1997, indicating that they had to meet and tried to alleviate her fears. She again visited the home unannounced on September 17, 1997, but no one was home. Smith sent another letter dated September 24, 1997, and told appellant that if she did not cooperate, Smith would contact the police. Afterward, appellant called and arranged a meeting. That meeting occurred on October 6, 1997. Following that investigation, she concluded that the allegations of physical abuse were unsubstantiated.
Based on the evidence presented at the hearing, the court found by clear and convincing evidence that Mark H. was neglected and abused and Mindy H. was dependent. The court did not comply with R.C. 2151.28(L) and render written findings of fact and conclusions of law with specific findings as to the existence of any danger to the children and any underlying family problems that are the basis for the court's determination that the children are dependent children. It is also difficult to determine from the court's findings which person the court found to be the abuser(s) of Mark H. and which allegations of abuse were found to be true.
The dispositional hearing immediately proceeded after the adjudication hearing, although it was then continued until May 1998. The following evidence was presented as to the issue of disposition of the children.
Susan Dandareau, a caseworker supervisor, testified as to the first custody case involving Mark H. and Mindy H. She first came in contact with appellant in September 1994 when there were allegations that the children's father, Duane H., had physically abused the children and that appellant had neglected the children. The children remained in the home and the agency provided services to the parents; namely, domestic violence counseling, substance abuse assessments for the father, parenting classes, assessment of the children for developmental delays, family aid services, day care services, and counseling for appellant. Through the counseling, appellant was diagnosed with dysthymia (the lowest level of depression) and a personality disorder not otherwise specified. Appellant continued in therapy for two years. She also had a psychiatric assessment and medication was prescribed for her.
Since appellant did not make significant progress in the first cycle of parenting classes by the end of 1994, the agency recommended repeating the classes for the first quarter of 1995. In December 1994, appellant was observed striking Mark H. and pulling him up by his hair during a parenting class. When confronted, appellant denied the incident and later said that she could not remember. The children were immediately removed from the home and placed them in foster care. Appellant continued parenting classes. Appellant also attended a special toddler behavior management class with Mark H. until July 1995. Appellant was also screened for substance abuse weekly from June 13, 1995 until September 19, 1995, all of which were negative.
In November 1995, the agency reviewed its decision. There were some concerns. Once appellant failed to answer the door for a scheduled visit because she had been sleeping. On another occasion, Mark H. had broken away and ran into the street, refusing to listen when appellant called him. The family aide was expressing concerns about mom yelling and screaming at the children. However, the agency was receiving positive reports from the therapist. So, in April 1996, the agency recommended reunification, and it occurred in May 1996 with protective supervision. In September 1996, appellant began a fourth, parenting class with the children. Protective supervision was terminated in February 1997. During this first custody case, two different men lived with appellant.
Because of the events in February 1998, Dandareau recommended permanent custody being given to the agency. She believed that appellant received the best possible help the first time and failed to properly care for her children. However, she did not consult with any of the caseworkers, appellant, or the persons making the allegations before coming to this conclusion. Her recommendation was based solely on the fact that Mark H. appeared to have been severely beaten after appellant had received extensive services from the agency.
Vivian Matthews, a family services caseworker for the agency, testified that she became involved with the case in February 1998. She met with appellant several times and supervised visitations. She also met with Duane H., the father of the children. At this time, appellant had ended her relationship with Steve B., George P., and Dan L. However, she began associating with another man, Jeff R., but denied living with him. Matthews' recommendation was that permanent custody be given to the agency because appellant was not able to care for the children without support services.
Following the dispositional hearing, the court issued its judgment. The court found that the children could not be placed with their parents within a reasonable period of time because it found by clear and convincing evidence that the factors listed at R.C. 2151.414(E)(1), (2), and (4) exist in this case and that an award of permanent custody to appellee was in the best interests of the children. The court further found that appellee made reasonable efforts to prevent the continual removal of the children from their home, but such efforts were unsuccessful. The court went on to find that the children were removed from their home a second time because appellant failed to remedy the reasons for the initial removal of the children in 1994. Further, the court found that appellant has failed to provide an adequate permanent home for the children and that they need a legally secure permanent placement which requires an award of permanent custody.
Appellant sought an appeal from this decision. In her three assignments of error, appellant argues that the court erred in making the findings that the factors set forth in R.C.2151.414(E)(1), (4), and (9) were not proven by clear and convincing evidence. These three factors all relate to the dispositional decision.
The disposition of a child determined to be dependent, abused, or neglect is controlled by R.C. 2151.35. The court may enter any order of disposition provided for in R.C. 2151.353. R.C. 2151.35(B)(3). If the court desires to grant permanent custody to the agency, it must determine: 1) pursuant to R.C. 2151.414(E) that the child cannot or should not be placed with one of his parents within a reasonable time; and 2) pursuant to R.C. 2151.414(D) that the permanent commitment is in the best interests of the child. R.C. 2151.353(A)(4).
R.C. 2151.414(E) provides that the court may consider all relevant evidence when it determines whether or not the children can be or should be placed with a parent within a reasonable period of time. The standard of proof required is clear and convincing evidence. However, if the court finds that any one of the sixteen factors listed in the statute exist, the court must find that the child cannot be placed with the parent within a reasonable time. The factors at issue in this case are as follows:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
"* * *
 "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
"* * *
 "(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent."
In her first assignment of error, appellant argues that the court erred as a matter of law when it considered the reason for removal of the children in 1994 as the basis for determining whether appellant had remedied the reasons for removal as required by R.C. 2151.414(E)(1).
In 1994, appellant consented to a finding that the children were dependent and neglected. The complaint in that case was not made a part of the record on appeal in the current case. Therefore, we cannot determine exactly what was the basis for removal of the children in 1994. However, the testimony during the current adjudication hearing indicates that the children were removed due to domestic violence, physical abuse by their father, and poor parenting skills by appellant. Extensive services were provided by the agency, and it determined that appellant had rectified the reasons for the removal of the children. The court returned custody of the children to appellant in 1997.
In the current case, the predominate reason for removal of the children was the alleged abuse by several men in the household. There was also one allegation that appellant had cut Mark H. with a knife. There was testimony at trial that appellant no longer uses one of the alleged perpetrators as a babysitter and that she ended her relationship with the other alleged perpetrator. The case plan developed under the most recent removal of the children did not indicate anything appellant could do to remedy the situation so that her children could be returned to her.
Appellee contends that the underlying reason for the removal of the children in 1994 and 1998 was that appellant fails to protect her children from being harmed by the men with whom she is involved. Therefore, appellee contends that the initial reason for removal of the children has not been rectified. We disagree.
R.C. 2151.414(E)(1) requires that the agency provide a case plan and time to remedy the situation that led to the removal of the children from the household. The other factors listed in R.C. 2151.414(E) do not require a case plan nor time to remedy the situation. In re Brandon O. (Jan. 31, 1997), Lucas App. No. L-96-115, unreported. The situation referenced in this statute is the current situation only. In the prior case, appellant met the goals set for her and her children were returned to her without any conditions. The case plan relating to that prior custody case cannot be used against appellant in this case.
We find that the juvenile court erred when it concluded that R.C. 2151.414(E)(1) had been proven in this case because there was no case plan nor time for appellant to correct the situation which caused the removal of her children in 1998. We do not hold that an agency must give every parent an opportunity to correct the situation that caused the removal of their children. We hold only that if the agency seeks to argue that the parent did not rectify the causes for removal, then it must give the parent a case plan and opportunity to do so. Appellant's first assignment of error is well-taken.
Appellant's second and third assignments of error are interrelated and are consolidated for purposes of our review. Appellant argues that the juvenile court erred when it found pursuant to R.C. 2151.414(E)(4) and (9), that the agency had presented clear and convincing evidence that appellant demonstrated an unwillingness to provide an adequate permanent home for the children by permitting them to become dependent, neglected, and abused and that she was unwilling to provide basic necessities or was unwilling to prevent her children from suffering physical, emotional, or sexual abuse or neglect.
With respect to both of these issues, appellant argues that there was no evidence presented from which the court could have concluded that appellant knew of the abuse that her children were subject to while she was working. In fact, the agency had investigated appellant's home three months earlier and found no evidence of any abuse. She also points to the fact that the medical evidence did not indicate any pattern of abuse and that there was no evidence that appellant should have recognized Mark H.'s injuries as abuse.
Appellant also argues that she demonstrated her commitment and willingness to care for her children by successfully completing the previous case plan to the extent that her children were returned to her, by divorcing the children's abusive father, and by ending her relationship with the men involved in this case.
Appellee basically contends that appellant demonstrated her lack of commitment by permitting the abuse in this case to happen a second time, denying the allegations of abuse, and failing to express any outrage that her children had been injured. The agency also argued that appellant was again living with another man whom she knows uses illicit drugs and seeks to have this court infer that the children, if returned, would be abused again.
While we recognize in this case that there is ample evidence that Mark H. was severely beaten a few days prior to February 1, 1998, there is no evidence from which the court could conclude or infer that appellant participated in the abuse, knew of the abuse, or should have known of the abuse. There also was no evidence that Mindy H. had been abused. While the foster mother testified that the children complained of being hit in the past, there is no evidence that they were abused at that time. Furthermore, there is no evidence that Steve B. had ever abused the children in the past. If this was the first occurrence of abuse, appellant could have done nothing to prevent it short of never leaving her children alone with another person. If there was a pattern of abuse occurring, there was no evidence presented to substantiate it. Therefore, we must conclude that the trial court erred when it found that there was clear and convincing evidence to support a finding that R.C. 2151.414(E)(4) and (9) were proven in this case. Appellant's second and third assignments of error are well-taken.
Having found that the trial court committed error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed. This case is remanded to the lower court for further proceedings consistent with this decision. Pursuant to App.R. 24, appellee is hereby ordered to pay the court costs incurred on appeal.
JUDGMENT REVERSED
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Peter M. Handwork, P.J.
 James R. Sherck, J.
 Mark L. Pietrykowski, J.
CONCUR.